(No. 5919.   May 19, 1933.)

BANNOCK COUNTY; LAURA B. BERG, in Her Capacity as Treasurer of Bannock County, Idaho, and in Her Capacity as Public Administratrix of Bannock County, Idaho; C. A. BROWN, in His Capacity as Assessor and Tax Collector of Personal Property of Bannock County, Idaho; W. H. WOODWARD, in His Capacity as Sheriff of Bannock County, Idaho; and the AETNA CASUALTY AND SURETY COMPANY, a Corporation, Appellants, v. CITIZENS BANK AND TRUST COMPANY, a Corporation; BEN DIEFENDORF, as Commissioner of Finance of the State of Idaho; and H. A. COLLINS, as Liquidating Agents in Charge of the Affairs of Said Citizens Bank and Trust Company, Respondents.

[22 Pac. (2d) 674.]

Coffin & Zener and Isaac McDougall, for Appellants.

B. W. Davis, for Respondents.

HOLDEN, J.—This is a suit to have certain public moneys deposited by the Treasurer, Public Administratrix, Tax Collector and Sheriff of Bannock county, Idaho, in the

now defunct Citizens Bank and Trust Company, adjudged to be trust funds, and as such entitled to preference in the liquidation of that bank, and to impress the assets of the bank with such trust. The Citizens Bank and Trust Company was engaged in a general banking business at Pocatello, Idaho, and was a lawfully designated and qualified depository of public funds. These officials deposited certain public funds in that bank on general deposit. September 22, 1931, the bank failed and the Commissioner of Finance of the State of Idaho took charge of its assets and affairs for the purpose of liquidating the bank. Thereafter claims for the amounts on deposit on that date to the credit of such officials were presented by them, respectively, demanding that the claims be classified as trust funds and allowed and paid as such, in the order provided by chapter 133, 1925 Session Laws, section 77, subdivision 2 (sec. 25–915, I. C. A.). January 22, 1932, the Aetna Casualty and Surety Company, pursuant to demand and under the obligation of a depository bond theretofore given by it in the penal sum of $15,000, paid Bannock county and took an assignment for the amount so paid, to wit, $15,000. February 2, 1932, the said claims were disallowed. In addition to that bond, the deposits were protected by various securities. February 14, 1932, this suit was commenced. By the complaint the appellants by appropriate allegations sought to have all public moneys on general deposit by the above-named officials on the day the Citizens Bank failed adjudged and held to be trust funds, and to have all the assets of the bank impressed with such trust. The respondents demurred to the complaint generally upon the ground that it did not state facts sufficient to constitute a cause of action, and also specially. The demurrer was argued by counsel for the respective parties, submitted to the court for decision, sustained and appellants given ten days within which to amend. The appellants declined to plead further, and on May 5, 1932, judgment was entered dismissing the complaint. This appeal is from the judgment.

The real and controlling question for determination in the instant case goes to the constitutionality of our Public Depository Law. We deem that question to be decisive, and that appears to be the view of both appellants and respondents, and each have filed very able and exhaustive briefs.

From territorial days down through statehood until 1905, the law did not authorize the depositing of public moneys in any bank, otherwise than on special deposit. In that year the first public depository law was enacted making provision for and regulating the depositing of public moneys on general deposit in banks by county treasurers. That statute has been amended to include counties, municipal corporations of every kind and class, school districts, irrigation districts, stumpage, highway, drainage and good road districts, and all *quasi*-municipal districts.

During the period depositing public moneys in any bank, except on special deposit, was prohibited by law, State Treasurer Storer deposited public moneys with C. Bunting and Company, bankers, on general deposit. The bank failed with a large amount of state money in its vaults. Then followed the suit of the First National Bank of Pocatello against C. Bunting and Company, bankers, in the district court of Bingham county, in which C. E. Thum was appointed receiver. The State *ex rel.* State Auditor and Attorney General filed a petition claiming a trust as to all the public moneys on general deposit in that bank at the time of its failure. On the trial, a motion for a nonsuit was granted against the state and judgment entered dismissing the petition. On appeal to this court (*State v. Thum, Receiver*, 6 Ida. 323, 55 Pac. 858) the respondent contended that a general deposit created the relation of debtor and creditor, and was, in legal effect, a loan to the bank, which could be made only by legislative authority, if at all, and that public money deposited in a bank on general deposit became the estate and property of the bank. The record shows that the opinion of this court was based solely on the construction of sections 6975, 6976 and 6977 of the

1887. Revised Statutes, which prohibited the depositing of public moneys in any bank, otherwise than on special deposit, and made a violation of the statute a felony. The only legislative authority the State Treasurer had was to deposit public moneys in his custody on special deposit. Concerning the matter of making deposits of public moneys, this court expressed itself as follows: ''Now, it must necessarily follow that the State Treasurer, *having no authority to deposit public money with a bank on general deposit, but he being authorized to deposit such money with a bank on special deposit,* the instant that C. Bunting and Company received public money from the state treasurer, it did so on special deposit, and that if the officers or any officer of said bank thereafter used said money, or commingled it with the money of the bank, or loaned it, such officers, or officer, by such act, committed a felony'' (emphasis ours), and held that ''public money deposited by a public officer in a bank, becomes a trust fund, and not part of the estate of the bank, and, in case of the insolvency of the bank, its receiver must treat such fund as the property of the true owner, and not of the bank.''

From which it appears that the opinion of this court was based upon three grounds: 1. No legislative authority to deposit public moneys in banks on general deposit. 2. Legislative authority to make *special deposits* of public moneys in banks. 3. Unlawful to deposit public moneys in any bank except upon special deposit. Thus largely making no *legislative authority* to place public moneys on general deposit in banks, on the one hand, and on the other hand, *legislative authority* to make *special deposits* of public moneys in banks, the decisive factors of the opinion. And in *First Nat. Bank v. C. Bunting & Co.,* 7 Ida. 27, 59 Pac. 929, 1106, decided in January, 1900, and before the enactment of our Public Depository Law, *State v. Thum, supra,* was affirmed.

So that we do not understand the opinions rendered by this court in those cases to hold, as contended by the appellants, that depositing public funds on general deposit creates

the relation of creditor and debtor, and, therefore, constitutes a lending of credit in violation of article 8, section 4, and article 12, section 4, of the Constitution of Idaho. We think this court made it rather clear that the public moneys deposited by the State Treasurer on general deposit in the Bunting bank were held in trust, because the State Treasurer was not authorized by law to so deposit those funds, the law having authorized him merely to make special deposits, and made it a felony to deposit public moneys in a bank otherwise than by special deposit.

We now come more directly to the consideration of the principal and most substantial contention made by the appellants, that subdivision 3 of section 77, chapter 133 of the Session Laws of the state of Idaho, 1925 (sec. 25–915, I. C. A.), is unconstitutional in so far as it may be designed and intended to apply to the deposit of public money, which, in turn, raises the question of the constitutionality of our current Public Depository Law, because, if the legislature can, without violating the Constitution of this state, provide for and regulate the depositing of public moneys on general deposit in banks, then it would follow that it could also provide for and regulate the order of payment of the debts of a bank in course of liquidation, in which public moneys have been placed on general deposit; in other words, fix the priorities of the payment of claims filed with the Commissioner of Finance of the State of Idaho engaged in winding up the affairs of such an insolvent bank, whose assets and affairs the commissioner has taken possession of, for the purpose of liquidation. In making this contention, the appellants vigorously urge and forcefully argue that placing public moneys on general deposit in a bank, under and as provided by our Public Depository Law, created the relation of creditor and debtor between the Citizens Bank and Trust Company and the depositing unit, and a lending of the credit of the county in violation of article 8, section 4, and article 12, section 4 of the Constitution of Idaho.

In support of their contention the appellants cite and rely upon the following cases: *Atkinson v. Board of*

*Commrs.,* 18 Ida. 282, 108 Pac. 1046, 28 L. R. A., N. S., 412, *Fluharty v. Board of County Commrs.,* 29 Ida. 203, 158 Pac. 320, *School Dist. No. 8 v. Twin Falls County Mut. Fire Ins. Co.,* 30 Ida. 400, 164 Pac. 1174, *Boise-Payette Co. v. School Dist. No. 1,* 46 Ida. 403, 268 Pac. 26, *White v. Pioneer Bank & Trust Co.,* 50 Ida. 589, 298 Pac. 933, and *Lawson v. Charter,* 112 W. Va. 108, 163 S. E. 813, approving *White v. Pioneer Bank and Trust Company, supra.* We will discuss the Idaho cases in the order in which they are cited by appellants.

*Atkinson v. Board of Commrs., supra,* was an original action commenced in this court, praying for the issuance of a writ of mandate against the commissioners of Ada county, requiring and compelling them to make an order calling an election for the purpose of voting on the formation of a railroad district in the manner authorized and provided for by an act of the 1909 session of the legislature (Sess. Laws 1909, p. 238). That act was intended to authorize the formation of railroad districts by a vote of the resident land owners of the districts. It provided for the manner of organizing the districts, the election of directors, the voting of bonds, the selection and acquiring of rights of way, and the building and constructing of lines of railroad and operating or leasing the same. The constitutionality of that act was challenged and this court held that "it was never anticipated or intended by the framers of the Constitution that counties, or other political subdivisions, would or could enter into the business of railroad building, but, on the contrary, the specific prohibitions found in the Constitution manifest a clear purpose and intent to prohibit the State or County, or any subdivision thereof, from entering into any such enterprise," and held the act to be a violation of the provisions of section 4 of article 8 of the state Constitution and contrary to the spirit of sections 2 and 3 of article 8 and section 4 of article 12 of the Constitution.

In *Fluharty v. Board of County Commrs., supra,* the board had appropriated $2,500 out of the current expense funds of the county in aid of the Northwest Livestock Asso-

ciation, under section 3040, Revised Codes. That section attempted to authorize the appropriation so made by the board. This court stated that section 4 of article 12 of the Constitution "in express terms prohibits a county through the Board of County Commissioners or by vote of its citizens or otherwise from making donation to, or in aid of, any company, corporation or association," and that "this association (Northwest Livestock Association) is a private corporation engaged in a private enterprise to which the County in the foregoing constitutional provision is prohibited from making a donation or appropriation. With such donation or appropriation made, it would place county funds donated or appropriated to such corporation under the control of the corporation and its officers, which funds would be appropriated to, and expended for, other purposes than the legitimate current expenses for the lawful administration of the government of the county, and by individuals not officers of the county or amenable to the laws authorizing the expenditure of public moneys," and held section 3040 to be unconstitutional and void.

In *School Dist. No. 8 v. Twin Falls County Mut. Fire Ins. Co.*, *supra*, the school district had become a stockholder of the insurance company and the company had issued a policy of insurance to the school district. The policy insured the school building of the school district against loss by fire. The building was destroyed by fire and the school district brought an action to recover on the insurance contract for the loss of the building. Judgment was recovered in the district court, but reversed, this court holding that "a school district cannot, under Section 4 of Article 8 and Section 4 of Article 12 of the Constitution, become a member of a county mutual fire insurance company," and that "the liability of a member of a county mutual fire insurance company is unlimited, and therefore a contract by which a school district seeks to become a member of such organization is void under Section 3 of Article 8 of the Constitution," and that "a contract of insurance between a school district and a county mutual fire insurance company is void,

and will form no basis for recovery as against the Insurance Company for loss by fire.''

In *Boise-Payette Lumber Co. v. School Dist. No. 1, supra,* the only question before this court, as appears from the opinion, was the constitutionality of section 7340, which purported to grant a lien on public school buildings for labor and material used in construction, alteration or repair, this court held that section was unconstitutional ''as making school districts responsible for debt, contract, or for default liability of contractor constructing school house, in violation of Constitution, Article 8, Section 4, and in accordance with public policy as shown by Article 8, Section 3, and Article 13, Section 6, and C. S., Section 6920.'' (Sec. 8–204.)

In those Idaho cases it does not appear to us that the question as to whether the placing of public moneys on general deposit in a bank created the relation of creditor and debtor between the bank and the depositor, and, therefore, a lending of credit was before the court, at least not directly.

In *White v. Pioneer Bank & Trust Co., supra,* White, assessor of Lemhi county, had illegally placed automobile license fees on general deposit in the bank in an account designated as ''Assessor of Lemhi County, by W. C. White.'' The fees were not deposited in compliance with the Public Depository Law. They had been collected by the assessor in his official capacity as assessor of that county and in the performance of his duty as agent of the Department of Law Enforcement of the state of Idaho. The bank failed and thereafter the assessor presented to the Commissioners of Finance a claim requesting that the amount on deposit at the time of the failure be classified as a trust fund payable according to the priority accorded by the provisions of the Bank Act, Sess. Laws 1925, chap. 133, sec. 77, subd. 2 (sec. 25–915, I. C. A.). The claim was disallowed as to the classification requested and instead classified for payment under the provisions of subd. 3 of sec. 77, *supra* (sec. 25–915, I. C. A.). White, as assessor, then commenced suit in the district court for Lehmi county to have the deposit declared

a trust fund and the amount thereof impressed with a trust until such time as the same was fully discharged by payment. The district court entered judgment vacating the order of the commissioner, adjudged the deposit to be trust funds, impressed with a trust and payable as such from the assets of the bank.

It will be remembered that the assessor had illegally placed public moneys on general deposit in the bank, the funds not having been deposited in compliance with the Public Depository Law prohibiting the depositing of public moneys in any bank on general deposit without security, and making it unlawful to do so. After the consideration of some preliminary questions, and in passing upon the question presented by those facts this court said: ''We come then to the chief point in the case, whether the money so on deposit at the time of the closing of the bank for insolvency should be classed for payment as a trust fund or the same as debts due any other depositor; that is, under subdivision 2 or 3 of Section 77, Chapter 133, Session Laws 1925.''

''It has heretofore been held by this Court that, although *public moneys were deposited other than upon special deposit, they remained nevertheless a trust fund* (emphasis ours), and in case of the insolvency of the bank it was the duty of the receiver to treat such funds as a trust fund and the property of the true owners; that the funds represented by said deposit were preferred and payable out of the assets of the bank prior to the payment of the depositors, stockholders or other creditors of the insolvent bank, and that such creditors were not to share *pro rata* in the public moneys so deposited (*Fidelity State Bank v. North Fork Highway District*, 35 Ida. 797, 209 Pac. 449, 31 A. L. R. 781, and cases cited therein; *Independent School District v. Porter*, 39 Ida. 340, 228 Pac. 253).''

It thus appears that this court expressly based its decision that public moneys placed on general deposit by the assessor were trust funds, and were, consequently, ''preferred and payable out of the assets of the bank prior to the payment

of depositors, stockholders or other creditors of the insolvent bank, and that such creditors were not to share *pro rata* in the public moneys so deposited," upon *Fidelity State Bank v. North Fork Highway District* and *Independent School District v. Porter, supra.*

In *Fidelity State Bank v. North Fork Highway District, supra,* this court held that "prior to the enactment of Chapter 42, Session Laws 1921 (Title 55, Chapter 1, I. C. A., Public Depository Law), the funds of a highway district illegally deposited in a bank upon general deposit remained the property of the district; the title thereto did not pass to the bank, neither did the relationship of debtor and creditor arise between bank and the district. In contemplation of law the bank received such funds impressed with a trust for the use of the true owner, and neither the illegal act of the treasurer of the district nor of the bank officials created any other relationship than that of bailor and bailee."

And in *Fidelity State Bank v. North Fork Highway District, supra,* this court based its decision upon *State v. Thum* and *First National Bank v. C. Bunting & Co., supra.*

In *Independent School District v. Porter* it is stated in the opinion of the court that "it has heretofore been held by this Court that, prior to the enactment of Chapter 42, although public moneys were deposited other than upon special deposit, they remain nevertheless a trust fund, and in case of the insolvency of the bank it was the duty of the receiver to treat such funds as a trust fund and the property of the true owner; that the funds represented by said deposit were preferred and payable out of the assets of the bank, prior to the payment of depositors, stockholders or other creditors of the insolvent bank, and that such creditors were not to share *pro rata* in the public moneys so deposited," citing *State v. Thum, supra; First Nat. Bank v. C. Bunting & Co., supra; Fidelity State Bank v. North Fork Highway Dist., supra.*

The writer of the opinion in *White v. The Pioneer Bank & Trust Company, supra,* copied *in toto* (see page 594, Idaho Report) that part of the above paragraph in quota-

tions. It must, therefore, at least be reasonably clear that this court in effect held in the White case, in harmony with all the former decisions of the court in which the question was squarely raised, and to which cases attention was expressly directed in the White case (as above shown), that public money deposited by a public officer in a bank, without authority of law, becomes a trust fund, and not part of the estate of the bank, and that in case of the insolvency of the bank, the fund must be treated as the property of the true owner and not of the bank. That rule was announced in the Thum case, *supra* (decided long before the enactment of a Public Depository Law in this state, or the Bank Act, *supra*), and was based upon the *illegality* of the depositing of public moneys in the bank, and not upon a construction of the said sections of the Constitution (invoked here by the appellants) that so depositing public moneys created the relation of creditor and debtor between the bank and the depositor and a lending of credit. So that adhering to and affirming in the White case, the rule thus early announced by the court in the Thum case could hardly be said, we think, to amount to holding that subdivision 3, of section 77, chapter 133, Laws of 1925 (sec. 25–915, I. C. A.), was unconstitutional, nor could it amount to holding that our Public Depository Law is unconstitutional.

In the instant case, however, the public moneys in question were placed on general deposit in the Citizens Bank & Trust Company in compliance with and as provided by our current Public Depository Law. If that statute is constitutional, then the deposits were legal, and must be classified and paid as provided by subdivision three of section 77 of the Bank Act (sec. 25–915, I. C. A.), *supra;* if not, then the deposits were illegal, and for that reason became and were trust funds, and remained the property of the true owner, did not become part of the estate of the bank, and would, consequently, be entitled to be classified as such under subdivision two of section 77, chapter 133, Laws of 1925 (sec. 25–915, I. C. A.), commonly known as the Bank Act.

In consequence, the question is squarely raised for the first time in this jurisdiction, as to whether the legislature may, in the exercise of its legislative power, provide for and regulate the placing of public moneys in banks, on general deposit, requiring such protection from loss as it may deem necessary.

The constitutional sections relied upon by appellants are as follows: "Article 8, Section 4: County (etc.) not to Loan or give its Credit: No county, city, town, township, board of education, or school district or other subdivision shall lend or pledge the credit or faith thereof, directly, or indirectly, in any manner to or in aid of any individual, association, or corporation for any amount or for any purpose whatever, or become responsible for any debt, contract or liability of any individual, association, or corporation in or out of this state."

"Article 12, Section 4: Municipal Corporation not to Loan Credit. No county, town, city or other municipal corporation, by vote of its citizens or otherwise shall ever become a stockholder in any joint stock company, corporation or association whatever, or raise money for or make donation or loan its credit to or in aid of, any such company or association: provided, that cities and towns may contract indebtedness for school, water, sanitary and illuminating purposes; provided, that any city or town contracting such indebtedness shall own its just proportion of the property thus created and receive from any income arising therefrom, its proportion to the whole amount so invested."

What, then, constitutes the lending of credit within the meaning of those provisions of the Constitution, and does the placing of public moneys in banks on general deposit constitute a loaning and lending of credit within the meaning of the Constitution? Space prevents doing more than citing a few of the cases bearing upon the question of the making of a "loan" by placing public moneys on general deposit.

The supreme court of Nebraska in construing a statute of that state, providing that loaning public funds, with or

without interest, should be deemed to be embezzlement, held that the term "loan" was employed in a restricted sense, and "includes those transactions only in which the conventional relation of borrower and lender exists, and has no application to the deposit in bank, for safe-keeping, of public funds by the custodian thereof who so far retains his control over them that they may be by him at any time reclaimed." (*State v. Hill,* 47 Neb. 456, 66 N. W. 541, 542.)

The supreme court of Iowa holds that "a general deposit of the funds of a school district in a bank, to the credit of the school district treasurer in his representative capacity, is not a loan of the district's funds to the bank, within Code, sec. 4840, declaring that if any school officer loans, without authority, any portion of the public moneys intrusted to him for safe-keeping, he shall be guilty of embezzlement." (*Hunt v. Hopley,* 120 Iowa, 695, 95 N. W. 205.)

And the supreme court of Iowa has also held that "a deposit in a bank does not constitute a loan of the money to the bank; and the statute of limitations will not commence to run against an action on a certificate of deposit until a demand for payment has been made, and such demand need not be made within the period of limitation when computed from the date of the deposit." (*Elliott v. State Bank,* 128 Iowa, 275, 103 N. W. 777, 111 Am. St. 198, 1 L. R. A., N. S., 1130.)

"And where a state treasurer places state funds in a national bank, subject to check, the bank giving security therefor, and agreeing to pay interest on daily balances, the transaction is a deposit, and not a loan to the bank." (*State of Nebraska v. First Nat. Bank of Orleans et al.,* 88 Fed. 947.)

A guardian deposited the moneys of his ward, as guardian, in a bank, which later failed. It was held by the supreme court of Pennsylvania that "the fact that small rate of interest was paid on such deposit, and that two weeks' notice of withdrawal thereof was required by the bank, was not sufficient to constitute such deposit a loan to the bank, or an investment for which the guardian would

be liable, in the event of a failure of the bank.'' (*In re Law's Estate*, 144 Pa. 499, 22 Atl. 831, 14 L. R. A. 103.)

A general deposit by a county treasurer of county funds, subject to check, is not a ''loan'' within the statutory or constitutional inhibition against the loaning of county funds, with or without interest. (*Allibone, Treasurer, v. Ames et al.*, 9 S. D. 74, 68 N. W. 165, 33 L. R. A. 585.)

The supreme court of Arkansas says that ''when a loan is made, the money is borrowed for fixed time, and the borrower promises to repay such amount at a fixed future date. But a general deposit is payable upon demand; in effect, the money thus deposited is kept under the control of the depositor, because it must be kept at all times subject to be paid upon his check. The money so deposited, or its actual equivalent, is returned to the depositor on demand.'' (*Warren v. Nix*, 97 Ark. 374, 380, 135 S. W. 896.) In that case it was argued, as in the instant case, that when a general deposit is made in a bank, the relation between the depositor and the bank is that of creditor and debtor.

We find the supreme court of the United States saying that ''the receipt of money by a bank, although it only creates a debt, is in a popular sense, the receipt of money for safe keeping, since the depositor can draw it out again at such time and in such sums as he chooses.'' (*Engel v. O'Malley*, 219 U. S. 128–136, 31 Sup. Ct. 190, 55 L. ed. 128.)

We think that in the interpretation of the sections of the Constitution in question, it is pertinent to consider what needs and requirements the banks were organized to serve and what use the people made of the banks. To keep money on the person or in the home or place of business invited danger of loss by fire, burglary and robbery, and the payment of accounts, taxes, notes and mortgages in cash was a clumsy, unhandy and inconvenient method of transacting business. The people, then, required an institution in which their money could be *deposited* and *safely kept,* and at the same time provide a more convenient and handy method of

paying accounts, etc. The banks supplied these needs, and the people used the banks for the *safekeeping* of their money and as most satisfactory conveniences in making payments for any and all purposes. Money deposited did not pass from under the control of the depositor. It could be deposited in the forenoon and checked out in the afternoon. There was no thought of loaning the money to the bank, because that would prevent its free and continued use by the depositor, checking it out from day to day as required. The people took their money to the banks to *deposit* it, and the banks accepted the money as *deposits,* and not as *loans.* It is doubtful if anyone ever took money to a bank for *deposit* under the impression that the transaction was to constitute a "loan," in the popular sense of that word. At the time of the adoption of the Constitution the word "loan" meant, as it has always meant, a transaction which created the customary relation of lender and borrower. Those transactions were occurring every day as were those involving the depositing of money. The people fully understood the difference between making a "deposit" in a bank and obtaining a "loan," because if they had not they would not have been able to do either.

In interpreting the sections of the Constitution in question, the language employed must be taken and understood in its natural, ordinary, general and popular sense. (*Busser v. Snyder,* 282 Pa. 440, 128 Atl. 80, 37 A. L. R. 1515; 1 Cooley's Constitutional Limitations, 8th ed., p. 130; 1 Story's Const., sec. 451.) In the popular sense, lending or loaning money or credit is at once understood to mean a transaction creating the customary relation of borrower and lender, in which the money is borrowed for a fixed time, and the borrower promises to repay the amount borrowed at a stated time in the future, with interest at a fixed rate. And that is the sense, then, in which the language employed in those sections must be understood, and so understood, no county, for example, shall lend or pledge its credit or faith, directly or indirectly, or in any manner

which would create the customary relation of borrower and lender. We seriously doubt that it was the intention of the framers of the Constitution to require the treasurers of counties, cities and towns to keep public moneys in their possession, at a time when protection of the funds from loss by fire, and otherwise, was either scant or wholly absent, particularly when banks were available supplying adequate protection and a convenient method of paying out the funds by check. Keeping the public money on hand and paying *it* out would be impracticable. Courts must give practical effect to the language of the Constitution. (*Reed* v. *Gallet,* 50 Ida. 638, 299 Pac. 337.) The Public Depository Law requires security for the protection of public moneys to be deposited in banks, thus providing a safe place for such moneys and a convenient method of paying it (or its equivalent) out. The rule is that before a legislative enactment will be held to be unconstitutional, it must clearly appear to be so, and if there be any doubt as to the constitutionality of an act, it must be resolved in favor of the act. (*Chambers* v. *McCollum,* 47 Ida. 74, 272 Pac. 707; *In re Edwards,* 45 Ida. 676, 266 Pac. 665; *Smallwood* v. *Jeter,* 42 Ida. 169, 244 Pac. 149; *Ingard* v. *Barker,* 27 Ida. 124, 147 Pac. 293.)

■ If the meaning of the Constitution is doubtful, a legislative construction will be given serious consideration by the courts. (*Genesee Chief et al.* v. *Fitzhugh et al.,* 12 How. (U. S.) 443-457, 13 L. ed. 1058; *People* v. *Olson,* 245 Ill. 288, 92 N. E. 157; *Nye* v. *Foreman,* 215 Ill. 285, 74 N. E. 140; *Kelso* v. *Cook,* 184 Ind. 173, 110 N. E. 987, Ann. Cas. 1918E, 68. See, also, 12 C. J., sec. 66, p. 714, and note.)

■ And "it is but a decent respect due the wisdom, the integrity and the patriotism of the legislative body by which any law was passed, to presume in favor of its validity until its violation of the Constitution is proved beyond all reasonable doubt." (*Ogden* v. *Saunders,* 12 Wheat. 212, 270, 6 L. ed. 606; *Noble* v. *Bragaw,* 12 Ida. 265, 85 Pac. 903; *Sanderson* v. *Salmon River Canal Co., Ltd.,* 45 Ida. 244, 263 Pac. 32.)

■ From what has been said it follows that we must, and we do, hold that our Public Depository Law, title 55, chapter 1, I. C. A., and subdivision 3, of section 25–915, I. C. A., attacked in the case at bar, are constitutional, and therefore, valid.

Judgment affirmed, with costs to respondents.

Budge, C. J., and Givens, Morgan and Wernette, JJ., concur.